IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS

| | | |
|---|---|---|
| LOUIS INGRAM | ) | |
| | ) | |
| Plaintiff | ) | |
| | ) | |
| | ) | No. 05 C 853 |
| v. | ) | |
| | ) | The Honorable William J. Hibbler |
| | ) | |
| DAVID BASILE AND ALFREDO SALINAS, | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM OPINION AND ORDER

Louis Ingram sued Chicago Heights Police officers David Basile and Alfredo Salinas, alleging that the officers violated his civil rights by falsely arresting him, using excessive force against him, and conducting illegal searches of his person and vehicle. The officers argue that qualified immunity protects them from Ingram's claims and move for summary judgment.

I. STATEMENT OF FACTS

On the night of February 13, 2003, Officer Anthony Bruno[1], Officer Alfredo Salinas, and Office David Basile of the Chicago Heights Police Department engaged in an undercover police operation accompanied by police officers assigned to the Gang Unit from the Cook County Sheriff's Department. (Bruno Dep. at 9-10). As part of their operations that night, the officers rode in unmarked police cars. (Bruno Dep. at 12-13). Officer Bruno worked in a car with a member of the

---

[1] Officer Bruno is not named as a Defendant in Ingram's Complaint.

1

Cook County Sheriff's Department, while Officer Basile and Officer Salinas worked as the "take-down" team for the operation in a separate car. (Salinas Dep. at 5-6; Basile Dep. at 10, 17-18).

Around six o'clock Officer Bruno parked his unmarked police car on Beacon Street facing west, just east of the intersection of Beacon and Campbell in Chicago Heights. (Bruno Dep. At 13, 15-16). Officers Basile and Salinas parked nearby on Boston Street, two blocks north of the intersection of Beacon and Campbell. (Basile Dep. at 13; Salinas Dep. at 6). From their position, Officers Basile and Salinas monitored communications from Officer Bruno on Band Five of their police radio. (Salinas Dep. at 5-6; Basile Dep. at 10, 17-18). Band Five, known as the tactical band, often contains less radio traffic than either of the other police bands. (Bruno Dep. at 18-20). City of Chicago Heights police officers use Band Five during undercover operations because it is a private car-to-car radio frequency which prevents anyone who may be monitoring the police bands from discovering an ongoing undercover operations. (Howard Dep. at 51-52). Unlike communications on other police radio bands, the communications on Band Five are not designated for recording by the Chicago Heights Police Department. (Pavesich Dep. at 35-36).

Approximately an half-an-hour after they began the operation, Officer Bruno informed Officers Salinas and Basile over Band Five of an interaction he had with Ingram. (Salinas Dep. At 6-8). Bruno told them that a green SUV had approached a group of males at the corner of Beacon and Dartmouth. (Salinas Dep. At 6-8). Bruno also told Officers Salinas and Basile that after approaching the group of males the SUV then proceeded to drive next to his unmarked police car. (Salinas Dep. At 6-8). Bruno relayed that the driver of the SUV (who turned out to be Ingram) asked

2

the Cook County Sheriff's officer in his vehicle, "what you got?" (Salinas Dep. at 6-8).² Officer Bruno recommended that Officers Salinas and Basile stop the green SUV. (Salinas Dep. at 7). Based on their conversation with Officer Bruno, Officer Basile believed that the driver of the SUV, Ingram, had attempted to buy or sell narcotics. (Basile Dep. at 17). Accordingly, Officers Basile and Salinas proceeded to stop Ingram's vehicle by driving their unmarked police car to the location described by Officer Bruno, using their flashing lights as they reached the green SUV. (Basile Dep. at 19-21; Salinas Dep. at 7-8).

According to Ingram, after he concluded the conversation with Officer Bruno, he left his car and walked to a friend's yard that was nearby to post a campaign sign to promote himself as a candidate for the upcoming Park District Commissioner in the April 2003 election. (Pl. Dep. at 50-53, 56). Ingram, however, discovered that the ground was too hard to place the sign in by hand, he returned to his SUV to get a cordless drill that he used when the ground was frozen. (Pl. Dep. at 26, 58-59, 61). As Ingram returned to his SUV, Officers Basile and Salinas approached in their unmarked police car with their lights flashing, stopped their car quickly, and exited with their guns drawn and pointed at Ingram. (Pl. Dep. at 62-63). Ingram saw the guns pointed at him, put his hands up and complied with the officers' orders to step away from the SUV. (Pl. Dep. at 63, 66-68).

According to Ingram, Officer Basile approached him, grabbed his arm, placed it behind his back, and handcuffed him. (Pl. Dep. at 66-68). Ingram then inquired, "[w]hat is going on," and Officer Basile slammed him against the door of his SUV, causing him to strike his chest, chin, and

---

² Ingram disputes the content of the conversation he had with Officer Bruno. But the substance of his conversation is not a material fact. Probable cause is based on what is known to Officers Basile and Salinas, and therefore only what Officer Bruno told Officers Salinas and Basile is material.

3

mouth on the vehicle. (Pl. Dep. 69, 72). Ingram suffered no abrasions, laceration, fractures, "or anything like that," as a result of Officer Basile's alleged act. (Pl. Dep. at 95). Ingram asked Officer Basile why he was being slammed into the SUV, and Officer Basile told him that, "Your interpretation of slamming and my interpretation of slamming are totally different." (Pl. Dep. at 69). Ingram informed the officers that he was not trying to cause any problems and inquired what he had done wrong. (Pl. Dep. at 72).

While Ingram was handcuffed, Officer Salinas searched the Plaintiff's SUV, and Ingram never objected to the search. (Pl. Dep. at 76-77). Ingram asserts that he did not give Officer Salinas consent to search his SUV. (Pl. Aff. at ¶ 1). As Officer Salinas searched Ingram's SUV, Officer Basile searched inside Ingram's pants, pockets, and underwear. (Pl. Dep. at 78-80). Officer Basile also allegedly grabbed and touched Ingram in the area of his crotch, looked inside his pants and underwear with a flashlight, searched inside Plaintiff's socks and shoes, and required Ingram to open his mouth and lift his tongue. (Pl. Dep. 28, 78-80; Internal Investigation interview of Basile at 13).

Salinas' initial search of Ingram's SUV did not recover anything, and neither did a second search. (Pl. Dep. at 86.) Officers Basile and Salinas then informed Ingram that he was free to go. The entire stop lasted around 30 minutes. (Pl. Dep. at 26, 86). Ingram later filed an incident report with the Chicago Heights Police Department. (Pl. Dep. At 27-30).

II.  Summary Judgment Standard

Summary judgment is appropriate when "there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue of material fact exists when "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S. Ct. 250, 91 L.Ed 2d

202 (1986). Under this standard, the moving party has the initial burden to identify "those portions of the pleadings, depositions, answers to interrogatories, and admission on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323, 105 S. Ct. 2548, 91 L.Ed. 2d 265 (1986). After the moving party establishes this burden of production, the nonmoving party "must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(c). Throughout the summary judgment analysis, the court must construe the facts and draw all reasonable inferences in the light most favorable to the nonmoving party. *Foley v. City of Lafayette*, 359 F.3d 925, 928 (7th Cir. 2004).

III. ANALYSIS

Officers Basile and Salinas argue that qualified immunity protects them from Ingram's suit. Government actors performing discretionary functions, such as police officers, are shielded from liability by qualified immunity when their conduct "does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Behrens v. Pelletier*, 516 U.S. 299, 305, 116 S. Ct. 834, 133 L. Ed. 2d 773, (1996) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818, 102 S. Ct. 2727, 73 L. Ed. 2d 396 (1982)). To determine whether officers are entitled to qualified immunity, the Court engages in a two-step inquiry, examining (1) whether the disputed conduct, as alleged, violated a constitutional right; and (2) if a constitutional right was violated, whether that right was clearly established at the time of the alleged conduct. *Saucier v. Katz*, 533 U.S. 194, 201, 121 S. Ct. 2151, 150 L. Ed. 2d 272 (2001); *Wernsing v. Thompson*, 423 F.3d 732, 742 (7th Cir. 2005). A right is clearly established if it would be clear to a reasonable officer that his

conduct was unlawful in the situation confronting the officer. *Saucier*, 533 U.S. at 202; *Sornberger v. City of Knoxville*, 434 F.3d 1006, 1013 (7th Cir. 2006).

A. False Arrest Claim

Ingram first contends that Officers Basile and Salinas arrested him without probable cause, thereby violating his Fourth Amendment rights. Under the Fourth Amendment, citizens can be subjected to a full custodial arrest only if the arresting officer has probable cause to detain them. *United States v. Tilmon*, 19 F.3d 1221, 1228 (7th Cir. 1994). Officers, however, may also conduct brief investigatory stops, known as *Terry* stops, even without probable cause. *Terry v. Ohio*, 392 U.S. 1, 21, 20 L. Ed. 2d 889, 88 S. Ct. 1868 (1968); *United States v. Scheets*, 188 F.3d 829, 837 (7th Cir. 1999). Probable cause exists if an officer reasonably believes, in light of the facts known to her at the time, that a suspect had committed or was committing an offense. *United States v. Reed*, 443 F.3d 600, 603 (7th Cir. 2006). It is a fluid, practical, common-sense determination. *Sornberger*, 434 F.3d at 1014. A police officer who relies on a radio call from a fellow officer that a person has committed or is committing a crime has probable cause to make an arrest regardless of whether the information supplied to the officer turns out to be correct. *United States v. Mounts*, 248 F.3d 712, 715 (7th Cir. 2001). Further, if a reasonably credible witness advises an officer that someone committed or is committing a crime, the officers have probable cause to make an arrest. *Mustafa v. City of Chicago*, 442 F.3d 544, 548 (7th Cir. 2006); *Speigel v. Cortese*, 196 F.3d 717, 723 (7th Cir. 1999).

In this case, it matters little whether the Court characterizes Officer Basile's and Officer Salinas's acts as a full-blown arrest or merely as a *Terry* stop, for, based upon the facts known to the

officers, they had probable cause to arrest Ingram.[3] Officers Salinas and Basile took part in an undercover surveillance operation in an area which drug deals are known to occur. During their operations, another officer informed them that Ingram approached a group of males nearby in his SUV and then approached the other officer, asking him "What you got?" Further, Officer Bruno advised Officers Salinas and Basile that he believed Ingram to possess drugs or to have solicited drugs. Ingram points to no facts that would have given Officers Salinas or Basile reason to doubt Officer Bruno's recitation of events. Consequently, based on Officer Bruno's description of Ingram's behavior, Officers Salinas and Basile had probable cause to arrest him.

B.     Excessive Force Claim

Ingram next argues that Officers Salinas and Basile used excessive force when they stopped him because they approached with their guns drawn, placed him in handcuffs, and slammed him against his vehicle. The Fourth Amendment excessive force inquiry looks to whether the force used to seize the suspect was excessive in relation to the danger he posed--to the community or to the arresting officers--if left unattended. *Jacobs v. City of Chicago*, 215 F.3d 758, 773 (7th Cir. 2000) Consequenly, a court must determine whether the intrusion on the citizen's Fourth Amendment interests was justified by the countervailing government interests at stake. *See Lanigan v. Village of E. Hazel Crest*, 110 F.3d 467, 475 (7th Cir. 1997). Relevant to this inquiry are the severity of the

---

[3] Courts have expanded the scope of *Terry* stops within the context of drug transactions because individuals engaged in drug transactions are presumed to be armed and dangerous. *United States v. Serna-Barreto*, 842 F.2d 965, 967 (7th Cir. 1988) ("many drug traffickers are armed and they sometimes shoot policemen"). In order to protect themselves, officers detaining individuals suspected of drug activity may approach suspects with their guns drawn, place suspects in handcuffs, or detain them momentarily in police vehicles, without transforming the stop into a full blown arrest requiring probable cause. *United States v. Askew*, 403 F.3d 496, 507 (7th Cir. 2005); *Serna-Barreto*, 842 F.2d at 967-968.

crime at issue, the potential threat to the safety of the officers or others posed by the suspect, and whether the suspect actively resists arrest or attempts to evade arrest by flight. *Jacobs*, 215 F.3d at 773. This test does not take into account the good or bad intentions of the officers. *Id.*

When Officers Salinas and Basile approached Ingram they had probable cause to believe that he had been involved in or had attempted a drug transaction. Drug arrests are inherently dangerous, and given the possibility that a potential suspect in a drug transaction might be armed it is reasonable for a police officer to approach a suspect with his weapon drawn. Indeed, if approaching a suspected drug dealer with weapons drawn does not even transform an investigatory stop into an arrest, *see United States v. Brown*, 366 F.3d 456 (7th Cir. 2004), it can hardly be said that an officer approaching a suspected drug dealer with his weapon drawn acts with excessive force. *See also Askew*, 403 F.3d at 508-09. According to Ingram, the officers drew their guns only as they first approached him, and the officers did not continue to leave their guns unholstered after Ingram had been handcuffed. Officers Salinas and Basile did not use excessive force by merely drawing their guns as they approached Ingram.

Neither does the alleged slamming of Ingram into the car constitute an excessive use of force. The right to make an arrest or investigatory stop necessarily carries with it the right to use some degree of physical coercion or threat thereof to effect it. *Miller v. Lewis*, 381 F. Supp. 2d 773, 784 (N.D. Ill. 2005). Not every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, violates the Fourth Amendment. *Miller*, 381 F. Supp. 2d at 786. Here, Officer Basile's actions were minimally forceful and did not cause Ingram even a mild injury. Officer Basile did not engage in any other violent conduct (and Officer Salinas did not even touch him).

Officer Basile had probable cause to believe that Ingram had committed a crime involving drugs, and his actions under those circumstances simply do not amount to excessive force.

C. Unlawful Searches Claims

Ingram's final claims, that the officers unlawfully searched his person and his vehicle, can be disposed of quickly. Given the Court's ruling that Officers Salinas and Basile had probable cause to arrest Ingram, they also could search his vehicle as a search incident to an arrest. *United States v. Pittman*, 411 F.3d 813, 815-16 (7th Cir. 2005); *United States v. Brown*, 133 F.3d 993, 998 (7th Cir. 1998). The rationale behind this rule is that a suspect might have a weapon within reach or contraband that he might dispose of or flee with, and therefore the officers may search the vehicle to protect their safety and to preserve evidence. *Pittman*, 411 F.3d at 815-16.

Consequently, the Court grants Defendants Basile's and Salinas's Motion for Summary Judgment.

IT IS SO ORDERED.

5/19/06
Dated

The Honorable William J. Hibbler